**STATE of Iowa, Appellee,**

v.

**Ralph Bingley MEANS, Appellant.**

**No. 54950.**

Supreme Court of Iowa.

Oct. 17, 1973.

Harold G. DeKay, Atlantic, for appellant.

Richard C. Turner, Atty. Gen., Thomas D. McGrane, Asst. Atty. Gen., and Lee R. Watts, County Atty., for appellee.

Heard before MOORE, C. J., and REES, REYNOLDSON, HARRIS and McCORMICK, JJ.

HARRIS, Justice.

Defendant appeals his manslaughter conviction. The prosecution arose from a fatal two car automobile accident. We reverse and remand.

Teresa Maeder lost her life in an automobile accident which occurred in Adams County, Iowa on the night of March 13, 1970. She was a passenger in a car driven by Mark Boswell on Iowa Highway 148 about one mile north of Corning. The driver has no memory of the accident from shortly prior to impact. Another passenger, Morris Boswell, did not testify. Boswell's car collided with an Oldsmobile in

which defendant was later found. The collision was at or near a point where highway 148 is intersected by a county dirt road. The vehicles were found, 40 feet apart, in a field 100 feet and 138 feet from the intersection. The dirt road extends north from highway 148. Traffic entering the highway from the dirt road is controlled by a stop sign. The road surface was dry.

After the accident defendant was found alone and unconscious in the Oldsmobile, laying in the front seat with his head and shoulders on the right side of the seat and his feet under the brake pedal. Damage to the Boswell car indicated impact across its front. Damage was to the right side of the Oldsmobile.

Mark Boswell testified he was driving his Chevrolet south on highway 148. He testified:

" * * * I am aware of the dirt road located where the collision took place. From this location straight west the pavement is fairly level and at least straight. As I came up around the hill I was driving on my side of the road. As I came up * * * around this large bend and as I approached this intersection I saw a flash of lights and this is all I can remember at the present time. When I saw the lights I was driving on my side of the road but I do not know how far I was from the intersection. I passed no cars as I came up around the hill and there were no cars coming toward me. * * * The next thing I remember lying in the car and I tried to pull myself out. * * *."

The testimony of Mark Boswell, the proximity of the dirt road controlled by the stop sign, the damage to the vehicles, and where they came to rest, constitute the sole evidentiary basis for the State's claim the defendant operated his vehicle recklessly.

In another count the State claims the defendant was intoxicated while operating his vehicle at the time in question. Several witnesses testified the unconscious defendant smelled strongly of alcoholic beverage after the accident. No one expressed the opinion he was intoxicated. A sample of his blood was withdrawn under a procedure intended to conform with section 321B.5, The Code. It was analyzed by a chemist, Margaret E. Poore. Her testimony of the results of her analysis was the only sufficient evidence of intoxication.

Over defendant's objections the trial court submitted the case to the jury with forms of verdict which mixed the two counts. We have no way of knowing whether the jury's subsequent verdict of guilty was based on the State's theory of reckless operation under count I or the defendant's intoxicated condition under count II, or both.

■ I. Defendant's third assignment of error is his claim there was a lack of sufficient evidence to raise a jury question under either count. A motion for directed verdict was made at the close of State's evidence. It was renewed, as required in State v. Werner, 181 N.W.2d 221 (Iowa 1970), at the close of all evidence. We first consider this assignment as it relates to the first count, the claim defendant was guilty of manslaughter as a result of reckless operation of his automobile. On this count we are convinced the evidence clearly fails to support a jury question.

The State argues defendant was shown to be in violation of certain statutory rules of the road. They urge the trial court was right in submitting the question of recklessness under the theory he failed to have his vehicle under control as required by section 321.288, The Code. In addition it is claimed the court was justified in submitting the question of recklessness under the theory defendant violated section 321.-322. Under that section defendant was required to stop at the stop sign and, after having stopped, to yield to vehicles on the protected highway in the intersection or so closely approaching it as to constitute a hazard. Other claimed violations under the motor vehicle code, including that of

excessive speed, were not submitted. The State did not except to the failure to submit these other theories so they can be ignored.

Our views on statutory traffic rules as the basis for recklessness in manslaughter cases are familiar and of long standing. They were summarized in State v. Kellison, 233 Iowa 1274, 1277, 11 N.W.2d 371, 373, as follows:

"As we have frequently pointed out, our statute, now section (690.10, The Code), does not change the common law definition of manslaughter, which might be committed in many ways. The unintentional killing of a human being by another in the doing of an unlawful act not amounting to a felony or in the doing of a lawful act in an unlawful manner was involuntary manslaughter at common law. (Citations). This court has not regarded a mere violation of a so-called rule of the road as an unlawful or criminal act, within the law of manslaughter. As having some bearing, see State v. Brighi, 232 Iowa 1087, 7 N. W.2d 9. As stated, we have required a showing of wanton and reckless indifference to the safety of others, in addition to such a violation, in manslaughter cases.

"While there may be some uncertainty as to just what is an unlawful act within the definition of manslaughter, we know of no case holding that death resulting from the commission by another of some act which is a misdemeanor and not a mere civil wrong and malum in se and not merely malum prohibitum is not manslaughter. (Citations), * * *." See also State v. Graff, 228 Iowa 159, 290 N.W. 97; State v. McLaughlin, 250 Iowa 435, 90 N.W.2d 303; and State v. Boner, 203 N.W.2d 198 (Iowa 1972).

The evidence does not even sufficiently show defendant was on the dirt road. No witness saw his vehicle there. The State argues defendant's presence on the dirt road may be deduced from Mark Boswell's testimony he saw no other cars on highway 148. We cannot subscribe to this deduction, especially in view of the fact the witness's memory does not extend to the time of collision.

It was error to submit count I to the jury.

II. We turn to the remaining count and note again there would be insufficient showing of defendant's intoxication in the absence of evidence of the blood test. Admission of the blood test is the subject of a separate assignment of error. The test was analyzed under a procedure the witness, Margaret E. Poore, described as the LaMotte-Heise test. That test, employed in this state for many years was held to be admissible in State v. Koenig, 240 Iowa 592, 36 N.W.2d 765. In holding such test results admissible we did not imply they were admissible without a proper foundation. The witness described the mechanics she employed in conducting the test in a laboratory in the basement of her home in Villisca, Iowa. She said one cc. of blood was introduced, together with 20 cc. of distilled water and one cc. of concentrated sulfuric acid into a boiling flask. She continued:

"Then I connected this to a condenser through which cold water was running, and then I boiled this solution. And the alcohol comes over, along with enough of distilled water, and I collect this and another test tube which is marked to a 10 cc., and I collect 10 cc.'s of the distillate then and from this I remove 2 cc. and put this in 2 other test tubes. 2 cc. in each test tube along with 1 cc. of the standard dichromate solution.

"This is placed—twirled around and placed in a water bath for 12 minutes and there is a coagulation reduction reaction that takes place between the dichroite iron and the alcohol and this change in color from the orange from the dichromate to the greenish or blue of the dichroite iron is what I read from my standards. It is a color comparison."

An exihibit described as a "comparison block" was later shown in the evidence as

defendant's exhibit A4. The witness used this comparison block in making the comparison of her colors. She described it as follows:

"It is a comparison block with three holes in it, and it is opaque. And you put your tubes, you standard tubes, in either side and your unknown tube in the center. And then you have ten or twelve tubes—I would have to figure that up for sure— and you find the one the unknown comes closest to matching."

During the chemist's testimony in chief the county attorney began to ask a question obviously intended to lay a foundation for the introduction of the test results. The witness interrupted the question and seized control of the course of her testimony. The foundation was never laid. Because of its crucial importance the record at this point will be set out in question and answer form.

"Q. Is that the standard method used for— A. That is the basic method used in testing alcohol in body fluids. The technique is a little different, but the principle is the same.

"Q. Did you test this blood then that you received— A. (Interjecting) Yes, I did.

"Q. (Continuing)—that is marked by the defendant Means? What was the result of your test? A. The test was 0.16 per cent or 160.

"Q. Now—

"MR. DEKAY: We are going to move to strike the answer for the reason there is no proper foundation laid at the present time.

"THE COURT: I assume that you can connect it up. Overruled." Although the testimony was never later connected up, the trial court would have been affirmed had it without reservation overruled the motion to strike at this point for two reasons. It was insufficient and it was tardy.

■ Reversible error may not be predicated on a general objection that no proper foundation has been laid for the reception of evidence. "* * * A party objecting to the offer of evidence for this reason must point out in what particular or particulars the foundation is deficient so the adversary may have an opportunity to remedy the alleged defect, if possible. (Authorities)." State v. Entsminger, 160 N. W.2d 480, 483 (Iowa 1968).

When the State failed to connect up the testimony as the trial court assumed it would defendant again moved to strike the evidence of test results. At that time the motion was considerably but not sufficiently expanded. Counsel then objected because the color comparisons were made on the basis of information supplied by a chemical products company. He stated: "And * * * therefore her testimony is based on hearsay testimony and * * * therefore she isn't competent. The witness is incompetent, no proper foundation and therefore her opinion would be conjectural and speculative."

■ It might be argued we should treat the trial court's original ruling on the defendant's motion to strike for lack of foundation as a reservation of ruling or an overruling only on the condition the evidence be later connected up. In considering the sufficiency of an objection there is a considerable difference when the objection is sustained rather than overruled. If sustained the trial court will be affirmed if the general objection is proper even though the objection is put in a form that is not or would not be sufficiently specific to preserve error for reversal. See State v. Hobbs, 172 N.W.2d 268 (Iowa 1969). But we do not believe the final objection was sufficiently specific when it was unconditionally overruled. The foundation was lacking for the testimony, not by reason of hearsay or incompetency of the witness but because there was no evidence of its reliability. We approve the following from

McCormick on Evidence, section 176, page 377:

■ "The party offering the results of any of these chemical tests must first lay a foundation by producing expert witnesses who will explain the way in which the test is conducted, *attest to the scientific reliability,* and vouch for its correct administration in the particular case. (Authorities)." (Emphasis added) There was a wholesale failure to show any scientific reliability for the test. But the objection, even the final objection, made to the evidence by counsel was insufficiently specific to alert the trial court as to the grounds or to accord the county attorney an opportunity to obviate the objection by supplying evidence of the scientific reliability. Defendant preserved no error on his claim there was no proper foundation for the evidence of the blood test results.

■ III. In another assignment defendant claims the evidence was insufficient to present a jury question the defendant was driving the automobile. Where the operation of an automobile is an element of a crime it may be proven by circumstantial as well as direct evidence. State v. Creighton, 201 N.W.2d 471 (Iowa 1972); State v. Hiatt, 231 Iowa 499, 1 N.W.2d 664. We believe the presence of the unconscious defendant alone in the automobile, occupying the driver's position, was sufficient to present a jury question on the claim he had operated the vehicle at the time of the accident.

■ IV. Defendant also complains of remarks he says were made in final argument by the county attorney. He says they were so improper as to deny him a fair trial. Defendant made or preserved no record of the remarks. Accordingly we have nothing to review. State v. LaMar, 260 Iowa 957, 151 N.W.2d 496; State v. Kendrick, 173 N.W.2d 560 (Iowa 1970).

By reason of the error discussed in division I, the case is reversed and remanded for a new trial.