48 P.3d 595

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

Dewitt LONG, aka Lamar Long Dewitt, Petitioner/Defendant–Appellant.

No. 23473.

Supreme Court of Hawai'i.

June 21, 2002.

Joseph S. Mottl, on the petition for petitioner/defendant-appellant.

LEVINSON, RAMIL, and ACOBA, JJ.; and MOON, C.J., Dissenting, with whom NAKAYAMA, J. Joins.

Opinion of the Court by ACOBA, J.

We hold that, while an objection of "insufficient foundation" is generally not adequate to preserve the objection for appeal, the basis for the objection in this case was evident from the context in which it was made and, thus, came within an exception to the general rule.

In a jury trial, Petitioner/Defendant–Appellant Dewitt Long (Petitioner) was convicted and found guilty of Count III, Theft in the Second Degree, Hawai'i Revised Statutes (HRS) § 708–831(1)(a) (1993), and Count IV, Promoting a Dangerous Drug in the Third Degree, HRS § 712–1243 (1993), of the subject complaint. His appeal, assigned to the Intermediate Court of Appeals (ICA),[1] presented the solitary question, apparently related to Count IV, of whether the first circuit court (the court)[2] erred in allowing Shirley Brown, a criminalist with the Honolulu Police Department, to testify that the substance Petitioner was charged with possessing was cocaine. In essence, on appeal Petitioner contended that "[t]here was no testimony [by Brown] concerning the maintenance and calibration of the [Fourier Transform Infrared Spectrometer (FTIR)] machine prior to its use[ ]" and, therefore, the "court here abused its discretion in admitting" the results of the FTIR test indicating the substance recovered from Petitioner was cocaine.

On March 14, 2002, the ICA issued a summary disposition order (SDO) affirming the

---

**1.** Chief Judge James S. Burns and Associate Judges Corinne K.A. Watanabe and John S.W. Lim issued the ICA's order in this matter.

**2.** The Honorable Russell Blair presided over this matter.

**350**

convictions. On April 19, 2002, we granted Petitioner's petition for writ of certiorari which reiterated his contention on appeal. No argument was presented with respect to the theft charge and, thus, we affirm the conviction for theft in the second degree.

### I.

We use the term "foundation" as it relates to the admission of evidence to mean "the factual foundation that satisfies the requirements for ... admission [of testimonial or physical evidence]." 1 C. Fishman, *Jones on Evidence Civil and Criminal* § 3:24, at 259 (7th ed.1992). Brown's testimony, elicited by Respondent/Plaintiff–Appellee State of Hawai'i (the prosecution), which is relevant to the question raised, was as follows:

A [BROWN]. Okay. Well, first I weigh the item, and [sic] was removed from the bag, and then I proceed to analyze it, and I do three different types of tests.

I did a color test, and then I did a microcrystalline test, and then I used one of the laboratory instruments as the final test.

Q [PROSECUTOR]. *Now, to summarize then, the color test is essentially kind of giving you some direction as to where you might look for a more definitive test;* is that correct?

A. *Yes.*

Q. *And the microcrystalline test is of a similar nature, only a little more precise?*

A. *Correct.*

Q. *And then you finally use a final test in order to make what, at least for your purposes would be considered to be a more conclusive determination; is that correct?*

A. *Yes.*

Q. And when you took and when you did the color microcrystalline test, what direction, at least, did that point you to in this instance?

A. Well, they indicated that the substance might contain cocaine.

Q. All right. So those tests, having given you that direction, what did you then do?

A. *Then I use[d] one of the laboratory instruments, and in this case I used the FTIR, which is the fourier transform infrared spectrometer.*

. . . .

A. Well, essentially what you do is you—the sample is prepared, and then is placed into the instrument [ (FTIR) ] where it is then subjected to infrared rays, and there are things that happen on the molecular level. *And in the end what you get is a graph, and from this graph you can determine what the substance is.*

. . . .

Q. And is there a particularly distinctive form of that graph for cocaine?

A. Yes.

. . . .

Q. And what did that substance contain?

A. *I found it to contain cocaine.*

(Emphases added.) Defense counsel objected as follows:

[DEFENSE COUNSEL]: *Your Honor, objection foundation. We'd object to insufficient foundation, request that the response be stricken.*

THE COURT: *I'll overrule the objection.* You may answer. In fact, have answered, and it will not be struck.

(Emphases added.) Thereafter, the defense cross-examined Brown:

Q [DEFENSE COUNSEL]. The FTIR machine, I'll refer to it as that, is there a single machine in the laboratory—lab, or are there several?

A. There are several.

Q. Now, the process of the machines are electronic, are they not, as opposed to mechanical? You plug it in and the measurements and all these things take place internally to the machine?

A. Yes.

Q. Approximately how many specialists such as you, work in the lab are actually hired, work at any time during the given week?

A. That use the instrument?

Q. Mm-hm.

A. About four.

Q. And are the instruments assigned specifically to each of you specialists, or might you use one machine and then another machine during the course of a week depending on which one is available?

A. *We use what's available.*

(Emphasis added.) On redirect examination, in apparent response to the defense's questions concerning the machines, the prosecution asked the following question:

Q. Are the machines—all the machines, all four of them tested from time to time and *calibrated to ensure their accuracy?*

A. All the instruments are checked.

(Emphasis added.)

The prosecution maintained that "[Petitioner]'s objection was ... general and non-specific" and, thus, "the alleged specific defect in foundation was not pointed out to the trial judge by [Petitioner.]"

## II.

### A.

This jurisdiction has yet to determine whether an objection on the basis of "insufficient foundation," without anything more, is specific enough to raise a foundational issue on appeal. Professor Addison Bowman characterizes a similar "lack of foundation" objection as an "example[ ] of [an] objection[ ] considered fatally general[.]" A. Bowman, *Hawaii Rules of Evidence Manual* § 103–2B, at 19 (2d ed.1998) (citation omitted) [hereinafter *Evidence Manual*].

An examination of case law from other jurisdictions reflects a majority view, similar to that of Professor Bowman's, that a simple objection such as "insufficient foundation" or "lack of foundation" does not preserve the issue on appeal. *See Hendrickson v. King County,* 101 Wash.App. 258, 2 P.3d 1006, 1012 (2000) ("An objection claiming a lack of foundation is a general objection." (Internal quotation marks and citation omitted.)); *Filan v. State,* 768 So.2d 1100, 1101 (Fla.Dist. Ct.App.2000) ("'[T]he objection 'lack of foundation,' like its first cousin 'improper predicate,' is not a 'specific ground of objection' within the meaning of section 90.104(1)(a) [requiring that an objecting party 'stat[e] the

specific ground of objection if the specific ground was not apparent from the context']." (Internal quotation marks and citation omitted.)); *Rogen v. Monson,* 609 N.W.2d 456, 459 (S.D.2000) ("The objection of 'lack of foundation' has no single defined meaning" and amounts to a "general objection[.]" (Internal quotation marks and citation omitted.)); *Tolver v. State,* 269 Ga. 530, 500 S.E.2d 563, 565 (1998) ("[O]bjection on the ground of lack of proper foundation without stating what the proper foundation should be is insufficient and presents nothing for review." (Internal quotation marks and citations omitted.)); *Castaneda by Correll v. Pederson,* 176 Wis.2d 457, 500 N.W.2d 703, 709 (Wis.Ct.App.1993) (characterizing as "non-specific" the objection "lack of foundation"), *reversed in part on other grounds by* 185 Wis.2d 199, 518 N.W.2d 246, 249 (1994); *State v. Malsbury,* 186 N.J.Super. 91, 451 A.2d 421, 425 (1982) ("The ... objection was that there was no proper foundation laid. No specification of the basis of this objection was offered. Thus, this is a general and legally incompetent objection."), *overruled on other grounds by State v. Matulewicz,* 198 N.J.Super. 474, 487 A.2d 772, 777 (1985); *Board of Assessors of Woburn v. Ramada Inns, Inc.,* 371 Mass. 894, 357 N.E.2d 776, 776 (1976) ("The[ ] general grounds [of 'lack of foundation and lack of proper method'] did not fairly raise the hearsay objection[.]"); *Tobeck v. United Nuclear–Homestake Partners,* 85 N.M. 431, 512 P.2d 1267, 1270 (N.M.Ct.App.1973) ("It has long been the rule in this state that general objections asserting that any given testimony is incompetent, irrelevant or immaterial or that no proper foundation has been laid are not sufficient to sustain a specific objection raised on appeal." (Citations omitted.)); *Cavanagh v. Ohio Farmers Ins. Co.,* 20 Ariz.App. 38, 509 P.2d 1075, 1080 (1973) ("We have reviewed the record and find that appellant's objection ('No foundation') was not sufficiently specific to preserve the matter for appellate consideration." (Citations omitted.)); *People v. Moore,* 13 Cal.App.3d 424, 91 Cal.Rptr. 538, 544 n. 8 (1970) (explaining that there is a "general rule that where the objection is lack of proper foundation, counsel must point out specifically in what respect the foundation is

deficient" (citations omitted)); *Hedges v. Conder*, 166 N.W.2d 844, 856 (Iowa 1969) ("We have said reversible error cannot be predicated upon the general objection that no proper foundation has been laid for admission of the opinion."); *Jimison v. Frank L. McGuire, Inc.*, 223 Or. 499, 355 P.2d 222, 224 (1960) (describing as "general in nature" an objection "for the reason that [the testimony] is incompetent, irrelevant, and immaterial and not a proper foundation laid" (internal quotation marks omitted)). *But see Hendrix v. State*, 40 Ark.App. 52, 842 S.W.2d 443, 447 (1992) ("It was argued in our conference that the objection to [lack of foundation] ... was not properly preserved for appeal[.] ... [W]e do not agree that the point was not preserved[.]"); *Wyatt v. State*, 620 So.2d 77, 79 (Ala.Crim.App.1992) ("[A]n objection that a proper foundation or predicate has not been made is specific enough to put the trial court on notice that counsel is challenging the prosecutor's procedure of presenting the evidence." (Citation omitted.)); *New v. State*, 760 P.2d 833, 834 (Okla.Crim.App. 1988) (determining that an objection of improper foundation was "sufficiently specific to preserve the authentication issue" under Oklahoma law).

**B.**

There are at least three theories as to why such an objection is insufficient to preserve an error on appeal. First, some jurisdictions maintain that, by failing to indicate the reason why foundation is lacking, the objecting party deprives his or her opponent of the opportunity to correct the error. *See, e.g., King v. City of Independence*, 64 S.W.3d 335, 341 (Mo.Ct.App.2002) ("It is particularly important that[,] where an inadequate foundation has been laid for admission of evidence[,] that the objection made be specific as such foundation deficiencies can frequently be remedied." (Internal quotation marks and citations omitted.)); *People v. Rodriguez*, 313 Ill.App.3d 877, 246 Ill.Dec. 723, 730 N.E.2d 1188, 1196 (2000) ("[T]he lack of a timely and specific objection deprives the State of the opportunity to correct any deficiency in the foundational proof."); *State v. McFarland*, 175 W.Va. 205, 332 S.E.2d 217, 232 (1985) ("A general objection overruled is of small value

to the objector on appeal. The rationale of this rule is that the proponent of the evidence should be given an opportunity to meet the objection by reframing the question, laying the necessary foundation, or by other means." (Internal quotation marks, italics, ellipsis points, and citation omitted.)); *Hedges*, 166 N.W.2d at 856 ("A party objecting to the offer of evidence [based on improper foundation] must point out in what particular or particulars the foundation is deficient so the adversary may have an opportunity to remedy the alleged defect, if possible." (Internal quotation marks and citation omitted.)).

A second theory is that the objection of "lack of foundation" does not advise both the trial judge and the opposing counsel of the defect in the foundation. *See Filan*, 768 So.2d at 1102 ("The ... objection ... 'lack of foundation' ... did not alert the [S]tate or the trial court as to what portion was missing from the foundation[.] ... With a specific objection ... the trial court [could] make an intelligent and informed decision [and] it would also give the [S]tate an opportunity to correct the defects[.]" (Citation omitted.)); *People ex. rel. New York Cent. R.R. Co. v. Vincent*, 68 N.Y.S.2d 202, 205 (N.Y.Sup.Ct. 1947) ("[A] party objecting to the admission of ... evidence should state the specific grounds of [the] objections in order that the Court may properly rule, and that the opposing party, if the objection is sustained, may resort to some other proper form of proof." (Citations omitted.)).

Finally, several jurisdictions explain that the objection "lack of foundation" is insufficient, not because it does not advise an opponent of the specific inadequacies in the foundation, but, rather, because it does not provide a trial court with an opportunity to fully understand the objection and, thus, to appropriately rule on it. *See Rogen*, 609 N.W.2d at 459 (explaining that a party's "lack of foundation" objection "provided only a 'general' objection; therefore, the trial judge was never able to understand the precise question or specific grounds upon which to rule"); *Malsbury*, 451 A.2d at 425 ("The next objection was that there was no proper foundation laid.... Objections must be spe-

cific so that the trial judges may have the opportunity to rule correctly." (Citation omitted.)); *Jimison,* 355 P.2d at 224 ("The objection ... made [—'not a proper foundation laid'—] ... did not advise the trial court of the contention now made on appeal.... [I]t is the duty of a party to point out his [or her] reasons for objecting to the trial court so that they may be fully considered in that court.").

### III.

■■■ Case law from our state indicates agreement with the third theory—that the purpose of requiring a specific objection is to inform the trial court of the error. *See State v. Fox,* 70 Haw. 46, 55, 760 P.2d 670, 675 (1988) ("Fairness *to the trial court* impels a recitation in full of the grounds supporting an objection to the introduction of inadmissible matters." (Emphasis added.) (Citing *S & W Crane Serv., Inc. v. Berard,* 53 Haw. 161, 164, 489 P.2d 419, 421 (1971).)); *see also Evidence Manual, supra,* § 12.1 at 407 ("The vice of the general objection is that it *fails to alert the court* to any flaw in the question or proffer and for that reason is the practical equivalent to no objection at all." (Emphasis added.)). We affirm that a "lack of foundation" objection generally is insufficient to preserve foundational issues for appeal because such an objection does not advise the trial court of the problems with the foundation.

Wigmore has explained that it is incorrect to argue that such an objection is not specific enough for *an opponent* because parties are not required to point out to an adversary how it is that his or her examination is lacking.

"It is often also said the purpose of a specific objection is to supply the opposing party with such information that he [or she] may intelligently argue the matter and cure any defect. *This theory, however, is mere pretense and is not to be taken seriously since the objector is under no obligation to furnish any explanation whatever* if he [or she] is fortunate to have a general objection sustained."

*City of Overland Park v. Cunningham,* 253 Kan. 765, 861 P.2d 1316, 1321 (1993) (quoting 1 *Wigmore on Evidence* § 18, at 824 (Tillers Rev.1983) (emphasis added)). The Georgia Supreme Court agrees that it is erroneous to conclude that the objection "lack of foundation" is insufficient for appellate purposes based on a theory that an objecting party owes his or her opponent an opportunity to correct the foundational error:

A long line of cases ... have recited as a rule that objection on the ground of lack of proper foundation without stating what the proper foundation should be is insufficient and presents nothing for review. *In suggesting that objecting counsel must educate opposing counsel on how to establish the missing foundational elements, the standard formulation of this rule is misleading. Rather, ... this rule is simply a statement of the general principle that counsel must assert objections with specificity to enable the trial court to intelligently rule on the objection and to create a clear record for the appellate court.*

*Tolver,* 500 S.E.2d at 565 (internal quotation marks and citations omitted) (emphasis added).

### IV.

■■■ While, generally, a "lack of foundation" objection does not adequately preserve a specific issue for appeal, an exception is recognized when the objection is overruled and, based on the context, it is evident what the general objection was meant to convey. A general objection in these circumstances is sufficient to preserve the error on appeal.

Hawai'i Rules of Evidence (HRE) Rule 103(a)(1) (1993) governs when a specific objection is required to preserve an issue for appellate review. That rule states:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

(1) Objection. *In case the ruling is one admitting evidence,* a timely objection or motion to strike appears of record, stating *the specific ground of objection, if the specific ground was not apparent from the context*[.]

(Emphases added.) Hence, a specific objection is not required where the defect is obvious from the context.

Other authorities have adopted the same caveat to general foundational objections that are *overruled*.[3] McCormick, who characterizes the objection "foundation" as a "general objection," 1 *McCormick on Evidence* § 52, at 226–27 (J. Strong ed., 5th ed.1999), explains that the effect of an overruled general objection depends on the context in which it is made:

> If the judge *overrules* a general objection, the objecting party may not ordinarily complain of the ruling on appeal by urging a ground not mentioned when the objection was made at trial. Yet, there are exceptional situations in which the appellate court will disregard this requirement and consider a meritorious objection not voiced to the trial judge.... *[I]f the ground for exclusion should have been obvious to judge and opposing counsel, the want of specification of the ground is immaterial for purposes of appealing the judge's action overruling the general objection.*

*Id.* § 52, at 225 (second emphasis added) (footnotes omitted); *see also State v. Davlin,* 263 Neb. 283, 639 N.W.2d 631, 651 (2002) ("If a general objection on the basis of insufficient foundation is overruled, the objecting party may not complain on appeal unless (1) *the ground for exclusion was obvious* without stating it or (2) the evidence was not admissible for any purpose." (Emphasis added.) (Citation omitted.)).

**3.** Some jurisdictions have said that general foundation objections that are *sustained* are sufficient to preserve appellate review. *See City of Overland Park,* 861 P.2d at 1321 (suggesting that general foundational objections sustained will preserve appellate review). In *State v. Means,* 211 N.W.2d 283 (Iowa 1973), the Iowa Supreme Court concisely explained the rule:

> In considering the sufficiency of an objection [based on lack of foundation] there is a considerable difference when the objection is sustained rather than overruled. *If sustained[,] the trial court will be affirmed if the general objection is proper, even though the objection is put in a form that is not or would not be sufficiently specific to preserve error for reversal.*

## V.

Petitioner claims that his objection rested on the prosecution's failure to elicit evidence that the FTIR machine involved was in fact working at the time of the tests. It is necessary, then, to ascertain whether, in the instant case, it was obvious that defense counsel's objection was that the prosecution had failed to establish the machine was in proper working order. In that regard, this court has said that,

> to be admissible, *"expert testimony must be both relevant and reliable."* [*State v. Maelega,* 80 Hawai'i 172,] 181, 907 P.2d [758,] 767 [ (1995) ]. *The reliability of expert testimony supplying scientific evidence depends upon the proper application of valid techniques grounded in valid underlying principles.* [*State v. ]Montalbo,* 73 Haw. [130,] 136, 828 P.2d [1274,] 1279 [ (1992) ]. It is axiomatic that such reliability is not possible in the absence of "a sound factual foundation." *See id.* at 138, 828 P.2d at 1280 (quoting *State v. Kim,* 64 Haw. 598, 604, 645 P.2d 1330, 1336 (1982), *overruled on other grounds by State v. Batangan,* 71 Haw. 552, 799 P.2d 48 (1990)).

Thus, "a fundamental evidentiary rule is that before the result of a test made out of court may be introduced into evidence, *a foundation must be laid showing that the test result can be relied on as a substantive fact."* *State v. Kemper,* 80 Hawai'i 102, 105, 905 P.2d 77, 80 (App.1995) (citation and internal quotation marks omitted). *Part of the foundational prerequisite for the reliability of a test result is a showing that the measuring instrument is "in*

*Id.* at 287 (emphasis added) (citation omitted). Inasmuch as the purpose of a specific objection is to explain to the trial court the basis therefor, a trial court's agreement with a general objection would appear to indicate that it understood the objection and, thus, more specificity is not required. *See* J. Strong, *McCormick on Evidence* 226 (5th ed. 1999) (" 'When evidence is excluded upon a mere general objection, the ruling will be upheld, if any ground in fact existed for the exclusion. It will be assumed ... that it was understood, and that the ruling was placed upon the right ground.' " (Quoting *Tooley v. Bacon,* 70 N.Y. 34, 37 (1877)).).

*proper working order." See State v. Thompson,* 72 Haw. 262, 263, 814 P.2d 393, 395 (1991) (citation and internal quotation marks omitted); *Kemper,* 80 Hawai'i at 105, 905 P.2d at 80.

*State v. Wallace,* 80 Hawai'i 382, 407, 910 P.2d 695, 720 (1996) (brackets omitted) (emphases added). Therefore, a proper foundation for the introduction of a scientific test result would necessarily include expert testimony regarding: (1) the qualifications of the expert; (2) whether the expert employed "valid techniques" to obtain the test result; and (3) whether "the measuring instrument is in proper working order." *Id.*

In the instant case, the criminologist was deemed qualified as an expert "with respect to weighing and analyzing the chemical content [of the substance]." The prosecution elicited testimony that the FTIR is "generally accepted in the scientific community as an accurate scientific device for determining the presence of cocaine[.]" The foundational question remaining was whether the FTIR machine was working properly on the day that Brown tested the substance.[4]

The prosecution had not asked any questions regarding the accuracy of the particular machine used in the instant case prior to the objection to Brown's testimony of the result of the test. The foundational requirement that there be established the accuracy of a machine upon which the result of a scientific test rests involves the most elemental of evidentiary propositions. As HRE Rule 103(a)(1) provides, there is no need to state the specific basis of a general objection where it is apparent from the context. Accordingly, the basis for Petitioner's foundational objection should have been obvious to the court.[5]

**VI.**

The FTIR test result with respect to the substance tested was crucial to establishing possession of cocaine. Petitioner objected to "insufficient foundation" when Brown testified that the graph readout indicated the substance tested was cocaine. That objection was overruled, but there is no evidence that the machine was in proper working order at the time it was used. The prosecution's question on redirect would not elicit necessary foundational evidence of the working status of the spectrometer *at the relevant time* of the test, because it was couched in terms of calibration "from time to time." Additionally, Brown did not answer in the affirmative when asked about calibration of the machine to ensure its accuracy, but said only that "all instruments are checked." The prosecution did not follow this response with a question as to the machine's accuracy at the time of the test.

Hence, there was lacking a foundation confirming that "the test result [could] be relied on as a substantive fact," *Wallace,* 80 Hawai'i at 407, 910 P.2d at 720 (internal quotation marks and citation omitted), *i.e.,* that the substance was cocaine. Under these circumstances, the admission of such testimony as to the nature of the substance tested would not be harmless beyond a reasonable doubt. *See State v. Crail,* 97 Hawai'i 170, 182, 35 P.3d 197, 209 (2001) ("Under the harmless-beyond-a-reasonable-doubt standard, the question is 'whether there is a reasonable possibility that error may have contributed to conviction.'" (Quoting *State v. Cabrera,* 90 Hawai'i 359, 365, 978 P.2d 797, 803 (1999)).); *see also State v. Pacheco,* 96 Hawai'i 83, 93, 26 P.3d 572, 582 (2001); *State*

---

**4.** The dissent states that because the expert testified that the FTIR machine requires "a fraction of a milligram or one to two milligrams" of the subject substance in order to produce an accurate result, and that the expert testified to using for her test "most likely a couple of milligrams," there was an additional foundational defect. Dissenting Opinion at 357–58, 48 P.3d at 604–05. We disagree with the dissent's conclusion that this testimony did not suffice to establish the application of valid techniques to achieve the test result. The expert's use of the phrase "most likely" was not inconsistent with her prior testimony referring to the need to use "a fraction of ... or one to two milligrams" to achieve an accurate test result.

**5.** The dissent claims that this opinion "encourages a trial court faced with an inadequate objection to ferret out the specific basis upon which to sustain it[.]" Dissenting Opinion at 357, 48 P.3d at 604. In our view, the holding in *Wallace,* decided over five years ago, is case law with which trial judges should be familiar.

*v. Valdivia,* 95 Hawai'i 465, 471, 24 P.3d 661, 667 (2001).

## VII.

For the foregoing reasons, the ICA's March 14, 2002 SDO is reversed, the first circuit court's April 27, 2000 judgment as to Count IV is vacated, and the charge involved is remanded for a new trial.

Dissenting Opinion by MOON, C.J., in which NAKAYAMA, J., joins.

Because I disagree with both the analysis and the effect of the majority opinion, I respectfully dissent.

Unabridged, the testimony of the prosecution's expert prior to the defense's initial objection reads:

Q. [By the prosecutor] And in general, is this fourier transform infrared spectrometer generally accepted in the scientific community as an accurate scientific device for determining the presence of cocaine?

A. Yes.

Q. And having—now, how much of the distance [sic] do you have to put into this machine in order to—for there to be an accurate reading by the machine of whether or not the substance contains cocaine"

A. Well, you can use a fraction of a milligram or one or two milligrams.

Q. Do you recall how much you used in this case?

A. Most likely a couple of milligrams.

Q. How many of these tests do you do a day, for example?

A. It can be from none to I can do over 50 or depending on what—

Q. In the space of a year, how many would you do?

A. It could be several hundreds.

Q. And so you probably don't remember specifically each test; right?

A. Correct.

Q. And in preparation for your testimony today, did you—did you look over any report that you had made in connection with this?

A. Yes.

Q. Okay. Now, having done that test, what—did you also weigh the whole substance that was in the plastic bag that had been given to you?

A. Yes.

Q. And first of all, how much did it weigh?

A. It weighed 0.095 grams.

Q. Okay. So to put it another way, 0.095 grams is 95 milligrams; is that correct?

A. Yes.

Q. Which is—well, we don't need to know, but can you transform that into ounces, you know, on the fly, or would you have to sit down and use a machine to do that?

A. Well, I can say 3.54 grams is one-eighth of an ounce.

Q. So this is a lot less than one-eighth of an ounce?

A. Yes.

Q. And what did that substance contain?

A. I found it to contain cocaine.

[By defense counsel:] Your Honor, objection foundation. We'd object to insufficient foundation, request that the response be stricken.

The trial court overruled the objection. On cross-examination, the expert testified:

Q. [By defense counsel] The FTIR, machine, I'll refer to it as that, is there a single machine in the laboratory—lab, or are there several?

A. There are several.

Q. Now, the process of the machines are electronic, are they not, as opposed to mechanical? You plug it in and the measurements and all these things take place internally to the machine?

A. Yes.

Q. Approximately how many specialists such as you, work in the lab are actually hired, work at any time during the given week?

A. That use the instrument?

Q. Mm-hm

A. About four.

Q. And are the instruments assigned specifically to each of you specialists, or might you use one machine and then another machine during the course of a week depending on which one is available?

A. We use what's available.

Thereafter, on re-direct examination, the prosecution asked, "Are the machines—all the machines, all four of them tested from time to time and calibrated to ensure their accuracy?" The expert responded, "All the instruments are checked."

I agree with the general proposition that, as the basis for an objection, merely stating "insufficient foundation" is inadequate to preserve a specific issue for appeal. I also acknowledge that we have held that incompetent evidence admitted without a proper objection or motion to strike is treated as competent evidence on appeal. *See State v. Wallace*, 80 Hawai‘i 382, 409–10, 910 P.2d 695, 722–23. However, the majority opinion holds that the specific basis for the objection in this case should have been obvious to the court because the absence of testimony that the FTIR machine was in proper working order when the expert tested the recovered substance was the only foundational element lacking. Majority Opinion (Maj.Op.) at 354–55, 48 P.3d at 601–02. I disagree.

According to the majority opinion, a proper foundation for the introduction of a scientific test result requires: (1) the qualifications of the expert; (2) whether the expert employed valid techniques to obtain the test result; and (3) whether the instrument in question was in proper working order. The majority opinion concludes that defense counsel's objection clearly related to the last element because it was the only foundational question remaining. Maj. Op. at 355, 48 P.3d at 602. However, in the present case, the prosecution's expert testified that "a fraction of a milligram or one or two milligrams" was required for the FTIR machine to yield an accurate reading. But when asked to identify how much of the recovered substance she

actually tested in the FTIR machine, the expert responded, "Most likely a couple of milligrams." The expert also testified that she did not specifically remember each test she performed. Thus, the expert's testimony as to the "couple of milligrams" she actually tested in the FTIR machine was pure speculation.

Clearly, the prosecution must establish that the amount of substance tested was sufficient to enable the FTIR machine to yield an accurate reading in order to satisfy the foundational requirement that valid techniques were used to obtain the test result. Here, the expert's testimony fails to establish that valid techniques were used. Therefore, the record indicates that there were at least two different foundational requirements that were arguably lacking. Given that an objection based upon a specific ground constitutes a waiver of all other objections, *State v. Matias*, 57 Haw. 96, 101, 550 P.2d 900, 904 (1976) (citation omitted), the trial judge should not assume the role of an advocate by selecting which of the available grounds for objection to pursue. Accordingly, I do not believe defense counsel was relieved of his burden of making a specific objection.

Finally, I disagree with the majority's view that the trial judge in this case was required to divine a specific basis from the defense's general objection. This case demonstrates that, even on appeal, with the benefits of time and a complete transcript, reasonable minds can differ as to what constitutes an obvious ground for an objection. Nevertheless, the majority opinion requires a trial court faced with an inadequate objection to ferret out a specific basis upon which to sustain it, presumably like the basis the majority deems "obvious" in the instant case.[1] Additionally, the majority opinion encourages counsel—without a specific basis in mind—to, nevertheless, gamble by making a general objection and hope that the trial court will sustain the objection or that an issue will be preserved for appeal. Such wagering tactics are further encouraged by the majority opinion's emphasis that a party is not required to

1. I note that in the majority's recitation of the testimony it deems relevant, the majority omits nearly four full pages of testimony, presenting a somewhat skewed depiction of the context in which the objection was raised.

advise an adversary how his or her foundation is lacking. I do not believe this court should encourage counsel to treat evidentiary issues like games of chance. Moreover, I believe that encouraging general objections will result in advocates laying the entire foundation for critical evidence anew, wasting court time and resources.

For the foregoing reasons I would dismiss the application for writ of certiorari as improvidently granted.